**CONTINENTAL CASUALTY COMPANY, et al.,**
**Plaintiffs,**

v.

**CITY OF JACKSONVILLE,**
**et al., Defendants.**

**No. 3:04–cv–1170–J–20MCR.**

United States District Court,
M.D. Florida,
Jacksonville Division.

Sept. 11, 2007.

Efe Poturoglu, John R. Gerstein, Gabriela Richeimer, Meredith Werner, Richard J. Pratt, Ross, Dixon & Bell, L.L.P., Virginia L. White–Mahaffey, James E. Rocap, III, Mark A. Black, Steptoe & Johnson, LLP, Washington, DC, H. Keith Thomerson, Jeffrey M. Moody, Hinshaw & Culbertson, LLP, Joseph T. Kissane, Cole, Scott & Kissane, PA, Richard Kyle Gavin, Rutledge Richardson Liles, Liles, Gavin, Costantino & George, Jacksonville, FL, Julie E. Nevins, Laura E. Besvinick, Parker D. Thomson, Hogan & Hartson, LLP, Ronald L. Kammer, Colleen Ann Hoey, Hinshaw & Culbertson, LLP, Miami, FL, Rebecca L. Ross, Ross, Dixon & Bell, LLP, Chicago, IL, for Plaintiffs.

Charles Wayne Alford, Alford Law Group, PA, John Sam Kalil, Law Office Of John S. Kalil, P.A., Derrel Quantrill Chatmon, Cindy A. Laquidara, General Counsel'S Office, B. Thomas Whitefield, Morford & Whitefield, PA, Jacksonville, FL, Dwight E. Jefferson, Dwight E. Jefferson, PLLC, Houston, TX, Grover G. Hankins, Hankins Law Firm, LLC, League City, TX, Helen K. Michael, Robert F. Ruyak, Robert H. Shulman, Howrey, Simon, Arnold & White, LLP, Washington, DC, Ralph Knowles, Robert E. Shields, Doffermyre, Shields, Canfield, Knowles & Devine, LLC, Atlanta, GA, William T. Jacks, Jacks Law Firm, Austin, TX, Richard Hugh Lumpkin, Ver Ploeg & Lumpkin, P.A., Miami, FL, Michael J. Baughman, Cohn, Baughman & Martin, Chicago, IL, Eric William Neilsen, Buckley & Fudge, P.A., St. Petersburg, FL, for Defendants.

## ORDER

HARVEY E. SCHLESINGER, District Judge.

Before the Court is a Motion filed by Plaintiffs Continental Casualty Company and Transportation Insurance Company (jointly "Transportation") seeking Final Summary Judgment. (Doc. No. 367, filed July 9, 2007.) Plaintiffs also filed a Statement of Material Facts as to which there is no Genuine Dispute in support of the Motion. (Doc. No. 366, filed July 9, 2007.) Defendants City of Jacksonville, Duval County School Board, and JEA f/k/a Jacksonville Electric Authority (collectively "the City" or "the City defendants") filed a Response in Opposition to both the Summary Judgment Motion (Doc. No. 390, filed July 24, 2007) and to Plaintiffs' Statement of Material Facts (Doc. No. 389, filed July 24, 2007). On August 6, 2007, the Court heard oral argument on the Motion. After carefully considering the Plaintiffs' Motion and the Defendants' Opposition thereto, and upon having the benefit of oral argument, the Court finds that no genuine issue of disputed material fact remains as to the narrow issue of whether Plaintiffs exercised good faith and due diligence in attempting to bring about the Defendants' cooperation.[1] Based on the following reasoning, the Court finds the Plaintiffs fulfilled their duty, and accordingly, *the Motion is Granted.*

## I. Background

Although the voluminous facts and tortured procedural history of this case need little introduction to the parties, the Court finds it necessary to fully recite and explain them because the parties have continued to argue two very different cases even though the Court has already resolved many of the outstanding issues. It seems the City has continued to repeat the same arguments as a means of preserving issues for appeal, because throughout the proceedings, and due to its disagreement with this Court's prior rulings, the City has all but vowed to seek an appeal.[2]

This matter had its genesis in a separate state court action, which was filed in Duval County Circuit Court on May 5, 2003, and captioned *Nora Williams v. City of Jacksonville,* Case No. 16–2003–CA–03263 ("*Williams* litigation," "*Williams* action," or "*Williams* plaintiffs"). The case was brought by the law firm of Doffermyre, Shields, Canfield & Knowles on behalf of a class of plaintiffs claiming physical and emotional injuries as a result of being exposed to lead, PCBs, arsenic, and other contaminants emanating from incinerators and dump sites owned and operated by the City. (Decl. of Richard Pratt, Ex. 1; Doc.

---

1. The City does not dispute the material facts of this case in so much as they relate to the issue of whether Transportation attempted in good faith to foster cooperation. Rather, the City argues material facts remain with respect to whether Transportation acted reasonably by failing to settle the *Williams* action, and whether a reasonable person would have entered into the settlement agreement that was consummated by the City and the *Williams* plaintiffs. However, the reasonableness of the settlement—and whether Transportation breached its duty to settle or compromise— are not issues before this Court. Accordingly, the City does not dispute the facts as stated by Transportation, but rather attempts to change the legal standard through which the facts should be viewed.

2. The City stated on numerous occasions in open court that it continued to reargue issues for purposes of preserving the issue for appeal. Furthermore, the City's Response to Plaintiffs' Motion for Summary Judgment (Doc. No. 390) and its Response to Plaintiffs' Statement of Material Facts (Doc. No. 389) are replete with references to the City's displeasure with this Court's prior rulings and express the City's intent to appeal. *See, e.g.,* Def.'s Mem. in Opp. at 4, n. 3; Def.'s Resp. to Pl.'s Statement of Material Facts at 4.

No. 245 at 2, filed Nov. 2, 2006.) Ten months later, on March 2, 2004, the City mailed notice of the *Williams* action to Transportation, and asked Transportation to provide a defense. (*Id.*) On May 18, 2004, after requesting and receiving an extension of time to respond, Transportation sent a response to the City via email informing the City that it would defend the City and pay "its fair share of reasonable and necessary expenses related to the defense" subject to a complete reservation of rights. (*Id.*, Ex. 2.) Transportation stated that the issue of indemnification would be addressed at a later date after more information was obtained. (*Id.*)

The City then chose the law firm of Steel, Hector & Davis as its defense counsel and Transportation assented to this choice. (*Id.*) As it had promised in its email transmission, Transportation funded the defense, eventually paying Steel, Hector & Davis approximately $3.9 million in attorneys' fees and costs. (*See* Doc. No. 179.) On May 21, 2004, the City responded to Transportation agreeing to a defense funded by Transportation, yet the City asserted that since Transportation had tendered the defense under a reservation of rights, the City had the right to control the defense. (Doc. No. 179; Doc. No. 127, Ex. C.)

On October 5, 2004 and October 6, 2004, Transportation transmitted five letters via certified mail, fax, and regular mail, explaining in detail the reasoning behind its reservation of rights with respect to certain claims asserted by the *Williams* plaintiffs. (Doc. No. 179; Doc. No. 127, Ex. E.) One of the bases for its reservation of rights was that Transportation had reason to believe that the City had potentially breached the cooperation clause provided in the insurance contract. (Doc. No. 127,

Ex. E.) The cooperation clause of the insurance contract provides:

**Assistance and Cooperation of the Insured:** The insured shall cooperate with the company and upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident.

(*Id.*) Transportation also revealed that it had reason to believe the City had been formulating a settlement with the *Williams* plaintiffs "without providing to Transportation sufficient information for Transportation to be able to assess the claims made against the City." (*Id.*) Transportation warned "[i]f the City settles the [*Williams* action] without the consent of Transportation, it will be considered a breach of the cooperation clause." (*Id.*)

The City issued a pointed response to Transportation's letters, outlining the City's disagreement with Transportation's reservations of rights. (Doc. No. 179; Doc. No. 127, Ex. F.) The City also implied that Transportation had acted unprofessionally in handling the claim, and in particular, the City took issue with the way Transportation had approached settlement, by asserting that Transportation's "representatives to the three mediation sessions ha[d] either been absent entirely (the first session) or scribes (the second and third sessions). Transportation asked no questions of either the plaintiffs, who are available to answer these questions, or the City." [3] (Doc. No. 127, Ex. G.) Thereaf-

---

**3.** Five formal mediation sessions were conducted between the City and the *Williams* plaintiffs. Transportation participated in four of the five sessions. (Doc. No. 179.)

ter, on November 5, 2004, Transportation filed the instant declaratory judgment action seeking a declaration as to the scope and nature of Transportation's obligations, if any, to the City under the relevant insurance policies. (Doc. No. 1.)

Almost immediately after the Complaint was filed in this declaratory judgment action, the City and the *Williams* plaintiffs entered into a Joint Defense Agreement.[4] (Decl. of Richard Pratt, Exs. 3, 4.) Under the terms of the defense agreement, the City and the *Williams* plaintiffs agreed to share privileged and confidential information, and to otherwise cooperate in defending the claims asserted by Transportation. (*Id.*, Ex. 4.) Pursuant to the agreement, the City and the *Williams* plaintiffs initiated communications regarding settlement of the *Williams* action. (*Id.*, Exs. 4, 5.) Transportation was not made a party to these settlement discussions.[5] (*Id.*) During the course of the settlement negotiations, the City and the *Williams* plaintiffs discussed what they referred to as either a "two tier" settlement proposal or a *Coblentz* agreement.[6]

In early December 2004, Mr. Shields, lead counsel for the *Williams* plaintiffs, proposed a "two tier" settlement structure where the City would pay a certain amount (tier one), then enter into a consent judgment for a much higher amount (tier two) that would only be enforced against the insurers. On December 8, 2004, and coincidentally after the City and the *Williams* plaintiffs had entered into their Joint Defense Agreement, Mr. Shields provided a copy of this "two tier" settlement structure to the City. (*Id.*, Exs. 3, 8.) The City, however, did not provide Transportation a copy of the "two tier" settlement approach. (*Id.*, Exs. 3, 9, 10, 13.)

On December 10, 2004, Transportation attended a mediation of the *Williams* action. At the mediation, Transportation stated that it would contribute $1 million towards settlement of the claims. (*Id.*, Exs. 11, 13.) Transportation also informed the City that Transportation would offer more based on additional information that was supposed to be forthcoming. (*Id.*, Exs. 16, 17.) During the course of the mediation, the City and the *Williams* plaintiffs held a brief meeting, in which Transportation was not in attendance, where the *Williams* plaintiffs "offered to settle for $90 million with the City making an initial payment of $45 million and assigning its claims against its insurer to

---

4. The agreement was entered into sometime after November 5, 2004, but before December 8, 2004.

5. Mr. Ver Ploeg, an attorney representing the City, stated in his deposition that "of course" there would be settlement related discussions that would not be shared with Transportation. (Decl. of Richard Pratt, Ex. 6.) In fact, Mr. Ver Ploeg testified that there were a series of conversations related to settlement "where the carriers (Transportation) were deliberately not invited." (*Id.*)

6. The legal term *Coblentz* agreement is derived from the case *Coblentz v. American Surety Co.*, 416 F.2d 1059 (5th Cir.1969). In *Coblentz* an insured and a claimant entered into a consent judgment after the insurer refused to defend. The Court in *Coblentz* found

that under Florida law the agreement was valid because "[h]aving elected to leave [the insured] to his own defenses" the insurer could not later challenge the form of the judgment. *Id.* at 1063. However, an insured and claimant may only enter into such an agreement where the insurer has refused to defend. *See id.; Ahern v. Odyssey Re (London) Ltd.*, 788 So.2d 369, 372 (Fla. 4th DCA 2001) ("Ordinarily, one who is not a party to a settlement agreement cannot be bound by its terms. An exception to this rule applies where, as here, an insurer wrongfully refuses to defend its insured."); *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So.2d 475, 477 (Fla. 3d DCA 1997) ("Where [ ] an insurer denies a claim and refuses to defend, the insured can take whatever steps are necessary to protect itself from a claim.").

collect the balance." (*Id.*, Exs. 3, 16.) The proposal included an additional provision that "in the event that there was no recovery against the insurance companies, the City would pay an additional $15 million." (*Id.*, Ex 3.) If the full $90 million was collected against the insurers, "the City would be reimbursed for its initial contribution." (*Id.*) The City rejected the offer. (*Id.*, Exs. 3, 15, 16.)

Following the mediation, Transportation wrote to the City:

> I understand that the City entities are currently engaging in a process of assessing settlement in order to decide whether they want to provide a further settlement offer to the [*Williams* plaintiffs]. During the mediation, the City entities agreed that they would discuss any potential offer with Transportation Insurance Company [ ] prior to making such an offer and allow [Transportation] to voice any objection it has. As you know, it is [Transportation's] position that it would not be required to participate in a settlement that is either unreasonable or achieved without its consent.

(*Id.*, Ex. 18.)[7] In response, the City wrote: "As you know, the City disagrees with [Transportation's] position, which we believe contrary to Florida law. [Transportation] does not have the right to 'bless' any settlement given [Transportation's] anticipatory repudiation of its obligations under the policies." (*Id.*, Ex. 19.) On December 23, 2004, Transportation responded, claiming that it had "not repudiated any of its obligations under the various policies of insurance issued to the City," and further warning "if the City of Jacksonville settles without [Transporta-

tion's] permission, it breaches the consent provisions and voids its rights to coverage." (*Id.*, Ex. 20.) Thus, by December 2004, as Cindy Laquidara, Chief Deputy General Counsel at the Office of General Counsel for the City acknowledged, "the City knew that Transportation wanted to be involved in all of the settlement negotiations." (*Id.*, Ex. 11.) Indeed, "there was no question in the City's mind ... that Transportation's view was that it wanted to be involved in all settlement discussions." (*Id.*) Also, Transportation reiterated to the City on eight or nine different occasions that it was Transportation's view that if the City settled with the *Williams* Plaintiffs, the City forfeited any coverage under the policies. (*Id.*) The City indicated that it understood this to be Transportation's position. (*Id.*)

The City, however, believing that Transportation's legal analysis was incorrect, ignored Transportation's repeated warnings and continued to engage in settlement negotiations with the *Williams* plaintiffs without including Transportation in the discussions. (*Id.*, Ex. 11.) On January 11, 2005, Ms. Laquidara called a "shade meeting"[8] with the Jacksonville City Counsel to discuss the *Williams* action. (*Id.*, Ex. 21.) On January 20, 2005, Transportation met with the City's defense attorneys, Janet Munn and Gerry Gibson both of Steel, Hector & Davis LLP., in order to also discuss the *Williams* action. (*Id.*, Exs. 22, 23.) In "late January," and without the involvement of Transportation or the City's Defense Counsel, Ms. Laquidara resumed discussing a "two tier" proposal with Mr. Shields. (*Id.*, Ex. 11.) During the period of late January 2005, but before

---

7. Transportation also added that, in its view, the *Williams* plaintiffs lacked proof with regards to the claims asserted by thousands of claimants, and, thus, the case was defensible and the settlement demand "is egregiously inflated." (Decl. of Richard Pratt, Ex. 18.)

8. A "shade meeting" refers to a meeting between a municipality and its legal counsel to discuss legal strategy. Under Florida law, such a meeting is authorized pursuant to section 286.011(8), Florida Statutes.

February 9, 2005, Ms. Laquidara recalled "there were a number of conversations between [herself] and Mr. Shields concerning potential settlement of the *Williams* action." (*Id.*, Ex. 11.) Also during this period, Ms. Laquidara made several settlement proposals, initially proposing that the City would contribute $8 million toward settlement. After a series of discussions, Ms. Laquidara eventually agreed that the City would contribute $25 million. (*See id.*, Exs. 11, 14.) In addition, Ms. Laquidara proposed that the parties enter into a $65 million consent judgment to be enforced against Transportation. (*See id.*, Ex. 11.) Transportation was at that time unaware of these settlement discussions. (*Id.*)

On February 9, 2005, at 10:59 a.m., the City sent Transportation an email stating: "Mr. Shields has once again advanced a settlement proposal and wants the City to consider its options. The offer *is not in writing* and it is premature to advance any proposal for review by the carriers." (*Id.*, Ex. 24) (emphasis added). At 1:43 p.m. on that same day, Ms. Laquidara sent Mr. Shields a detailed *written* "Settlement Proposal" memorializing a proposal made by the *Williams* plaintiffs and a counterproposal from the City. (*Id.*, Exs. 11, 25.) Both proposals contemplated that forty-percent of the first $40 million paid to the *Williams* plaintiffs would be derived from insurance proceeds. (*Id.*) Both proposals also attached "a Consent Judgment[ ] to be entered if [Transportation] challenge[s] the absence of a judgment." (*Id.*) The City failed to inform Transportation about either proposal. (*Id.*, Ex. 3.)

On February 11, 2005, the City and Transportation held a telephone conference concerning a potential settlement. During the call, the City told Transportation that the City was contemplating a settlement whereby the City would pay $25 million over three years, purchase a number of houses in the contaminated area, and agree that the City and the *Williams* plaintiffs would pursue recovery against the insurers for the amounts paid and for an unspecified amount.[9] (*Id.*, Ex. 26.) The City, however, assured Transportation that it "would not consummate any settlement agreement without first discussing it with Transportation and giving Transportation an opportunity to provide input and improve upon the terms." (*Id.*, Ex. 3.)

On February 14, 2005, Transportation wrote to the City informing it that Transportation "cannot and does not consent to this settlement based on the information and analysis provided to date." (*Id.*, Ex. 26.) Transportation also reminded the City that it was "defending [ ]the City with respect to these claims" and expected the City to "uphold its contractual obligation to cooperate with Transportation in this defense and not settle with the [*Williams*] plaintiffs or make voluntary payments without Transportation's consent." (*Id.*) Transportation also explained that it was "willing to contribute to a reasonable settlement." Transportation, however, cautioned that "[w]e do expect and demand that the City not settle any claim that it asserts are Transportation's responsibility without Transportation's consent. Transportation does not consent to the settlement being discussed, as you have explained it, and any effort to enter into such a settlement would be in direct breach of the City's contractual duties to Transportation." (*Id.*)

In response, the City represented that the ongoing discussions between the City

9. The City declined to tell Transportation that the City and the *Williams* plaintiffs were at that time contemplating a consent judgment of $65 million, which was recoverable against Transportation. (Decl. of Richard Pratt, Ex. 26.)

and the *Williams* plaintiffs were merely "preliminary negotiations, initiated by counsel for the *Williams* plaintiffs, and Ms. Laquidara is simply reacting to those discussions." (*Id.*, Ex. 27.) The City also took issue with Transportation's assertion that the City was in breach of the insurance contract stating that "[w]e do not view the City's efforts to seek options for its protection as a breach of any obligation owed under the law. . . ." (*Id.*)

During February and early March, Ms. Laquidara and Mr. Shields continued settlement discussions without informing or involving Transportation. (*Id.*, Ex. 11.) On March 8, 2005, the City Council held another shade meeting to discuss the *Williams* action. (*Id.*, Ex. 28.) Ms. Laquidara went into the meeting intending to "lay out the issues in the case and identify the proposal made by Mr. Shields and ultimately recommend it." (*Id.*, Ex. 11.) On March 10, 2005, Ms. Laquidara emailed Mr. Shields and informed him that "[w]e have made significant progress, with great difficulty, putting the 12.5 [million] on the table this fiscal year and the same next. . . ." (*Id.*, Ex. 29.)

On March 14, 2005, Mr. Shields sent a draft of what he described as a "demand letter" to Ms. Laquidara for her comment. (*Id.*, Ex. 30.) Ms. Laquidara did not provide any comments to Mr. Shields on the draft demand because "[w]e had had those arguments back and forth, and—and that's the best deal I could get." (*Id.*, Ex. 12.) Although the March 14, 2005 letter was styled a "demand letter" it was understood that it was actually the product of two months of negotiations between the City and the *Williams* plaintiffs. (*Id.*) When the City forwarded the March 14, 2005, "demand letter" to Transportation, it stated "[w]e *just received* a settlement proposal from the plaintiffs in the *Williams* matter, which we enclose." (*Id.*, Ex. 31) (emphasis added). In its trans-

mittal letter forwarding the settlement proposal, the City assured the following: "[w]e plan on contacting you in the very near future to schedule a meeting with counsel for [the *Williams* plaintiffs], City representatives and defense counsel to address issues raised by the proposal, afford [Transportation] an opportunity to negotiate a resolution, and[ ] provide [Transportation] and City representatives a vehicle to consider [Transportation's] options under the circumstances." (*Id.*, Ex. 31.) On the same day that the transmittal letter was sent, Ms. Laquidara informed Mr. Shields that the City "believes that it would be good to reconvene with [the mediator in the *Williams* action, Jonathan Marks] and [Transportation]." (*Id.*, Ex. 32.) In response, Mr. Shields stated:

> I am not sure I understand what purpose would be served by another conference. I suspect it would merely be a vehicle for [Transportation] to assert that the proposed settlement is unreasonable, that it does not have sufficient information, and that it needs more time. My experience . . . is that an insurance company like [Transportation] will not be realistic about settlement until just before trial or disposition of motions for summary judgment in the [Declaratory Judgment] action. Thus, I think there is no chance that [Transportation] will make any offer at this stage. It seems to me we would merely be playing into their hands by participating in another session with them.

(*Id.*)

In the March 14, 2005 settlement proposal, Mr. Shields provided two options: (1) the City and Transportation would agree to pay $75 million and remediate the contaminated sites, or; (2) the City would agree to a Consent Judgment of $75 million and remediation of the sites, but the City would only pay $25 million and assign

all of its rights to collect insurance proceeds for both the Consent Judgment and the site remediation to the *Williams* Plaintiffs who would then pursue an action against Transportation. The agreement also provided a mechanism whereby the City and the *Williams* Plaintiffs would share the proceeds of any amounts collected from Transportation. (*Id.*, Ex. 31.) The letter indicated that the settlement offer would remain open for thirty days. (*Id.*)

On March 21, 2005, Transportation wrote to the City reiterating Transportation's views concerning the City's obligation to cooperate in the defense of the *Williams* action. The letter stated:

> This letter reiterates Transportation's position: the City may not settle with the [*Williams* plaintiffs] without Transportation's consent if the City intends to seek indemnification from Transportation for the contemplated settlement amounts. The City's right to indemnification is purely a product of the contracts between the City and Transportation. The City cannot claim entitlement to the policy privileges on the one hand while denying its obligations to comply with conditions precedent to coverage on the other. As we explained to you previously, the City is obligated to cooperate with Transportation under the plain, unambiguous contract terms, and any voluntary payments made by the City to settle the litigation will be at the City's expense. If the City settles these matters without first obtaining Transportation's consent, then the City will have forfeited any right to claim coverage for any of the amounts settled, including damages that otherwise may be covered. You have cited no law in support of the City's position, unconvincingly noting only that you find the abundant contrary

authority we cited previously to be "[un-]persuasive."

(*Id.*, Ex. 33.)

On March 31, 2005, the City responded to the March 21 letter stating: "[w]e also agree that insurers are entitled under Florida law to reserve their rights, but [Transportation] squints through rose-colored glasses when it suggests that the cooperation clause remains intact once it has." (*Id.*, Ex. 34.) After further elucidating its contrary position to that of Transportation, the City closed by saying: "[t]he City will continue to cooperate with [Transportation] in the defense, but will also decline to accept [Transportation's] insistence upon approving any decision to settle so long as its reservation of rights is maintained." (*Id.*) Transportation responded to the City's letter by citing several cases that it contended supported its view on the issue of the insured's duty to cooperate. (*Id.*, Ex. 37.)

On April 1, 2005, Transportation again wrote the City noting that because the March 15 letter indicated that the City was intending to set up a meeting with the *Williams* plaintiffs, it was "awaiting ... your stated proposed scheduling." (*Id.*, Ex. 35.) Transportation stated that it was "happy to meet with, and indeed wishes to meet with, [the City] (and whatever other parties that you deem appropriate) in connection with the proposed settlement." (*Id.*) Transportation offered "to meet with all parties or any subset thereof if you so authorize and [ ] to set up a meeting in Jacksonville or Miami with those parties and/or [the *Williams* action mediator]." (*Id.*) On April 5, 2005, the City authorized Transportation to contact the *Williams* plaintiffs directly, but also stated:

> We agree that a conference should be scheduled, and will seek to coordinate one. You need not await such a conference, however, to contact the [*Williams*

plaintiffs]. We too discovered that [the *Williams* action mediator] is not available anytime soon, but neither is that a requirement. Mr. Shields is presently in trial, so its hard to say when [the *Williams* plaintiffs] can meet, but his unavailability should smooth the path towards securing an extension of the deadline.[10] We've a pending request to the [*Williams* plaintiffs] to provide us with available dates.

(*Id.*, Ex. 12.) As such, the City obligated itself to schedule a settlement conference between the City, the *Williams* plaintiffs, and Transportation. (*Id.*)

Meanwhile, Ms. Laquidara continued to have conversations with Mr. Shields in which she assured him that she would recommend the March 14, 2005 settlement proposal to the City Council. (*Id.*) In fact, in April 2005 Mr. Shields believed that the City had agreed to a "settlement in principle." Mr. Shields described the agreement as follows:

As you know, by letter dated March 14, 2005 to [Ms. Laquidara], we outlined our best and final offer to settle the case. We indicated in the letter that, in the event [Transportation] do[es] not agree to accept our offer, we were willing to enter into a separate arrangement with the City pursuant to which we would pursue its claims against [Transportation]. After making that offer, in a series of telephone conversations and e-mails, [Ms. Laquidara] confirmed that she would recommend to [the] City Council, and she expected the Council to follow her recommendation, that the City enter into the Tier II arrangement with us in the event [Transportation] did not accept the offer in Tier I. In a series of telephone conversations and e-mails at the time, I indicated to [Ms. Laquidara] that because it appeared we had a

settlement in principle, we would not continue to expend funds on the development of our expert witnesses. On several occasions in telephone conversations, I told [Ms. Laquidara] I was relying on her representation regarding a settlement in principle in not doing things, such as working with our experts, that we should be doing in the event we didn't have a settlement. I was assured that I had nothing to worry about.

(*Id.*, Ex. 38.) Transportation had no knowledge that the parties had agreed to a "settlement in principle." (*Id.*, Ex. 12.) Instead, in an April 15, 2005 letter, the City expressed to Transportation that the City and the *Williams* plaintiffs were "very much in an adversarial relationship . . . ." (*Id.*, Ex. 39.)

On April 13, 2005, the City informed Transportation that Mr. Shields was only willing to extend the settlement demand deadline if Transportation contacted him directly. (*Id.*, Ex. 40.) On the same day that Transportation received this message, a representative of Transportation, Mr. Richard Pratt, called Mr. Shields and requested a meeting. During the call, Mr. Pratt expressed his desire to "meet and talk about trying to resolve the case," and to that end Mr. Shields and Mr. Pratt exchanged dates they would be available for such a meeting. (*Id.*, Ex. 41.)

In "late April," despite the understanding that a "settlement in principle" was in place, Ms. Laquidara informed Mr. Shields that she could not go forward with the settlement under its present terms. (*See id.*, Exs. 12, 38.) After informing Mr. Shields of this, Ms. Laquidara described him as being "quite upset." (*Id.*, Ex. 12.)

---

**10.** The Court assumes that the "deadline" the letter is referring to is the settlement demand deadline that was set forth in the March 14, 2005 letter.

On May 4, 2005, the City and Transportation met in Atlanta and discussed whether the City would be interested in a "high/low settlement agreement" [11] with the *Williams* plaintiffs. (*Id.,* Ex. 17.) Thereafter, the City and Transportation met with Mr. Shields and asked whether [the *Williams* plaintiffs] would be open to a high/low agreement. (*Id.,* Ex. 12.) Mr. Shields stated that he would be open to considering such a settlement option. (*Id.*) The meeting ended with Transportation agreeing to provide a written proposal to the City and to the *Williams* plaintiffs, which "would include a resolution of [the *Williams* plaintiffs' claims] and the City's claim for coverage." (*Id.,* Ex. 12.)

On May 11, 2005, Mr. Shields confirmed to Transportation that the *Williams* plaintiffs would be interested in a high/low settlement so long as the high was at least $75 million. (*Id.,* Ex. 33.) On that same day, Mr. Shields wrote to Ms. Laquidara stating that the original Tier I $75 million settlement offer presented in the March 14 proposal was formally withdrawn. However, Mr. Shields added that the Tier II settlement offer, where the City would contribute $25 million and the *Williams* plaintiffs would then pursue Transportation for $75 million, remained open for an additional ten days. (*Id.,* Ex. 42.)

On May 17, 2005, Transportation responded to Mr. Shields' communication and agreed to continue discussing the high/low settlement proposal. Transportation noted, however, that in its view the $75 million "high" figure was excessive and there was no basis for such a figure. (*Id.,* Ex. 43.) Notwithstanding this, Transportation stated that it was willing to listen to "whatever arguments you wish to make with regard to this figure," and offered to continue negotiating with the *Williams* plaintiffs. (*Id.*) Transportation added, "[w]e understand that you are continuing your discussions with the City. Our client would like to be informed of all settlement discussions and be given an opportunity to participate. We will continue to provide our views to the City regarding your settlement demands." (*Id.*)

On June 3, 2005, the City sent Transportation a potential high/low settlement proposal for review. (*Id.,* Ex. 44.) The proposal provided a low of $25 million, and a high that was dependent on the resolution of various legal issues. (*Id.,* Exs. 13, 44.) The City and Transportation spoke by telephone on June 9, 2005, to discuss the settlement. (*Id.,* Ex. 13.) During the call, Transportation proposed a low of $15 million and a high of $35 million. (*Id.,* Ex. 16.) The City requested that Transportation put its high/low proposal in writing. (*Id.,* Ex. 13.)

On the same day that the City and Transportation held a telephone conference, Mr. Shields sent Ms. Laquidara a draft of a letter that was addressed to Transportation asking for her "comments or suggestions." (*Id.,* Ex. 45.) The draft letter stated that the *Williams* plaintiffs would not recommend a high/low arrangement in which the low was less than $50 million and the high was not at least $125 million. (*Id.*) In an email response, Ms. Laquidara said, "I do not think that the low is reasonable, and I hope that you will

---

11. A "high/low settlement agreement" is similar to a typical settlement agreement, with some added features. The general theory behind the agreement is that the plaintiff and defendant insure the other against an excessive verdict. The plaintiff and defendant agree that the outcome of the case will be no less than X dollars (the low) and no more than Y dollars (the high). If the verdict is in favor of the plaintiff, and exceeds Y dollars, the plaintiff gets Y dollars. If the verdict is in favor of the defendant, and lower than X dollars, the plaintiff gets X dollars. *See Perdue Farms Inc. v. Nat'l Union Fire Ins. Co.,* 197 F.Supp.2d 370, 374 (D.Md.2002).

demonstrate flexibility if [Transportation] appears with some funds." (*Id.*, Ex. 46.) In a return email, Mr. Shields stated:

> We could have more flexibility on the low if the methodology for deciding the actual payment did not build in the delays of an appeal. In any event, I don't believe that [Transportation] is likely to come up with any specific or reasonable offer given the current stage of things. I believe that if you want to apply pressure to it to make an actual offer, you should agree to the two-tiered approach we previously proposed (with appropriate adjustments for the delay) and let us shift the battle to coverage issues. I also believe that it is counterproductive to forcing [sic] [Transportation] to be reasonable, to seek to delay any of the scheduled deadlines in the state court action.

(*Id.*) Transportation did not receive a copy of this communication, nor was it informed of its substance. (*Id.*, Ex. 13.)

On June 13, 2005, Transportation forwarded a draft high/low proposal to the City. Under the proposal, there would be a guaranteed low of $15 million, with Transportation paying up to $2.5 million and the City and its other insurers paying the remainder. (*Id.*, Ex. 47.) There would also be a high of $35 million with Transportation paying up to $10 million and the City and its other insurers paying up to $25 million. (*Id.*) The letter further stated: "[p]lease note, however, that there are a number of aspects to this agreement that require City input. Most notably, the City would need to figure out what high/low it was willing to live with given Transportation's contribution." (*Id.*) Transportation also noted that there were "various legal issues relating to the underlying claim and to coverage that would also have to be

discussed in more detail." (*Id.*) Transportation, however, noted that it was willing to work with the City to "make the settlement more appealing to the plaintiffs." (*Id.*) Transportation also acknowledged receiving Mr. Shields'$125 million/$50 million high/low settlement proposal, commenting that in its view "such numbers [were] extraordinarily inflated" and Transportation would not consent to a settlement in that range. (*Id.*)

On June 16, 2005, Transportation asked to meet with the City to discuss the *Williams* action. (*Id.*, Ex. 48.) On June 20, 2005, Ms. Laquidara wrote to Transportation that she did not believe the *Williams* plaintiffs would take a low of less than $25 million and that she did not believe the high of $35 million was realistic. (*Id.*, Ex. 49.) She further stated: "Of course, we have no objection to your calling [the *Williams* plaintiffs'] counsel and attempting to reach an agreement with them. If they agree to your proffered offer, we can then devise our own split for contributions." (*Id.*) Transportation responded on the same day, stating:

> Thank you for your response on the settlement issue. Is the City committing to paying the first $25 million of any settlement regardless of the structure? Is it the City's position that it does not want to have any further input into any discussions with the [Williams plaintiffs]? Is the City now taking the position that it will not provide full policy releases if a settlement can be negotiated? We just need to understand what you are telling us. Do you want to discuss this further?

Transportation then reiterated its request for a meeting.[12] (*Id.*)

---

12. On June 20, 2005, Transportation again asked to meet with the City in order to discuss settlement strategy. (*Id.*, Ex. 3.)

On June 29, 2005, Transportation again wrote to the City, attaching a brief proposed letter to Mr. Shields for review and comment. Transportation stated:

This letter is based on an assumption, confirmed in our recent conversation, that the City has committed to paying $25 million of any settlement. If this settlement is achieved, [Transportation] would expect a full policy release for known and unknown policies and known and unknown claims. Please let us know if you disagree with those terms.

(*Id.*, Ex. 50.) Transportation again asked to meet with the City to discuss the *Williams* action, despite the City's prior suggestions that such a meeting would be a "waste [of] time." (*See id.*) The City declined Transportation's request a meeting.[13] (*Id.*, Exs. 3, 17.) On July 1, 2005, the City wrote the following:

We have previously written extensively on our views regarding the City's cooperation, and will not further belabor the point. Suffice it to say that we disagree.... With regard to settlement, the City's willingness to commit money towards settlement is separate and apart from any negotiated resolution with the [*Williams* plaintiffs] on a high/low. We have no problem in your endeavoring to have Mr. Shields agree to numbers which we know will be rejected (as do you), but out commitment to participate in that settlement must separately be negotiated with [Transportation].

(*Id.*, Ex. 51.)

While Transportation was attempting to engage the City in a dialogue concerning the defense of the *Williams* action, including a settlement under a high/low structure, Ms. Laquidara, without Transportation's consent or knowledge, renewed negotiations with Mr. Shields on the previously discussed "two tier" settlement approach.[14] (*Id.*, Ex. 13.) On July 5, 2005, after a series of discussions between herself and Mr. Shields, Ms. Laquidara asked the City Council to notice a "shade meeting" for July 18, 2005 to discuss the *Williams* action. (*See id.*, Exs. 13, 52.)

On July 6, 2005, Transportation renewed its request for a meeting noting that it had "requested to meet with the City and its counsel for weeks to discuss the *Williams* litigation, but to no avail." (*Id.*, Ex. 53.) Transportation also asked the City for instructions on whether to send the draft letter to Mr. Shields, saying:

If you or the City have any specific comments regarding the letter or wish to discuss the approach or any other issue, please contact us so that we can move forward (if that is, in fact, what the City wishes to do). In addition, we need to have a firm commitment from the City on the amount it will contribute to the high/low and the scope of release to Transportation since Transportation will be committing to a substantial amount of money if the offer is accepted by the [*Williams* plaintiffs]. Please let us hear from you this week.

(*Id.*) Transportation again asked the City to meet on July 14, 2005. (*Id.*, Ex. 54.)

On July 18, 2005, the City Council held a shade meeting to discuss the *Williams* action. (*Id.*, Ex. 55.) On July 19, 2005, Ms. Laquidara sent Mr. Shields a draft

---

**13.** In response to Request Number 139 of Transportation's Request for Admissions the City admits that it never set up a meeting with Transportation to discuss settlement in June 2005. The City stated that it declined a meeting on account of "time pressures in the defense of the case," but asserted the City and Transportation discussed settlement during telephone conferences. (*Id.*, Ex. 3.)

**14.** Ms. Laquidara could not recall the exact date the renewed discussions began. (*Id.*, Ex. 13.)

**1326**

document entitled as follows: "The Undersigned Attorneys Confirm Each Has The Authority To Enter Into The Following Agreement, In Line With The Previously– Expressed Authority In The Attached Letter Being Tendered To Insurance Carriers." (*Id.*, Ex. 56.) Despite its title, the draft was never "tendered to [Transportation]." (*Id.*, Exs. 3, 13, 15.)

On July 20, 2005, Ms. Laquidara sent Mr. Shields a draft Release and Waiver of Claim. (*Id.*, Ex. 57.) This document was not sent to Transportation. (*Id.*, Ex. 3.) On July 21, 2005, Mr. Shields sent Ms. Laquidara a draft agreement. (*Id.*, Ex. 58.) On July 22, co-counsel for the *Williams* plaintiffs, Wayne Alford, sent an email to counsel for the City stating that a proposed scheduling order requesting to move the trial date in the *Williams* action "should reflect that the September 7, 2005 hearing time will stay on the calendar which we plan on utilizing to get approval of the settlement." (*Id.*, Ex. 59.) Transportation was not made aware of this plan. (*Id.*, Ex. 13.)

On July 22, 2005, the City revealed to Transportation that the City had renewed its settlement negotiations with Mr. Shields.[15] (*Id.*, Ex. 17.) In response, Transportation demanded that the City immediately provide information on all settlement discussions, including all offers and demands made. (*Id.*, Ex. 60.) In addition, Transportation noted its frustration with the City, and again reiterated that it did not consent to the City's settlement approach:

> Finally, and most troubling perhaps, the City promised us that it would keep us informed in this litigation and give us an opportunity to have meaningful input. It promised biweekly calls. Yet when we asked to have such calls set up, the City failed to do so. We also asked for an in person meeting. The City refused. We have asked for the evaluations of this case and the four initial plaintiffs and the City has not provided them to us. Indeed, the City has confirmed that it is withholding certain analysis from its counsel for which Transportation paid.

> There is no doubt that the City has breached the cooperation provisions in the policies. There is also no doubt that Transportation has been severely prejudiced by the City's actions. Lest there be any misunderstanding, let us make Transportation's position clear. It does not consent to the City's unilateral negotiations with the claimants; it has not consented to the settlement (the terms of which have not been disclosed to Transportation); and it contends that the City has breached the insurance contracts by its actions.

(*Id.*) Notwithstanding this, however, Transportation asked to "set up a meeting

---

**15.** Mr. R. Hugh Lumpkin of the firm Ver Ploeg & Lumpkin, was serving as the City's coverage counsel during this period and he was the individual who revealed to Transportation that the City was negotiating with the *Williams* plaintiffs without involving Transportation. (*Id.*, Ex. 17.) Interestingly, during his deposition there was some discussion concerning the meanings of the terms "dissemble" and "dissimulation." The Court would like to note that "dissimulation" is merely the noun form of the verb "dissimulate," which is a synonym of the verb "dissemble." According to Webster's Dictionary, "dissemble" means: (1) to give a false or misleading appearance to; conceal the truth or real nature of; or (2) to put on the appearance of; to feign. In the colloquial sense, it means to act as a hypocrite when dealing with others. The Court does not mention this merely because it has an interest in lexical semantics and etymology, but because the Court finds it quite fitting and ironic that the terms "dissemble" and "dissimulation" were used during this case, and especially fitting that they were used during the course of a deposition of one of the City or *Williams* plaintiffs' attorneys.

to discuss these matters immediately." (*Id.*)

On July 28, 2005, the City responded:

[I]t is long since plain that we disagree on the law, including whether a defense under a reservation of rights entitles [Transportation] to review materials in advance of their filing.

. . . .

The City clearly is entitled to discuss matters with Plaintiffs, and one view of present legal precedent fully supports the notion that the City can consummate a settlement even without [Transportation's] knowledge.

. . . .

Last, [Transportation] has made it very clear that it will not approve any settlement in keeping with the previous settlement rejected by it in March 2005. Once we have learned more of Plaintiffs' intentions with regard to settlement, we will let you know.

(*Id.*, Ex. 61.) Notwithstanding the intimation made to Transportation that the terms of a settlement were uncertain and that the City was waiting to hear from counsel for the *Williams* plaintiffs, Ms. Laquidara testified that by July 28, 2005, "the monetary terms, which were the same monetary terms almost precisely as [those in the proposal found in the] March [15] letter were pretty much negotiated." Or as another one of the City's attorneys testified, "the essence of a deal was struck with the [C]ity sometime around July 21, 2005." (*Id.*, Ex. 10.)

On July 28, Mr. Shields sent an email to Ms. Laquidara stating:

Our position continues to be that it is a mistake to give the insurance companies any more time because they will respond by acting like they are interested in settlement but will not do anything. That course of action would give them the opportunity to act like they were being reasonable and might put us at risk of further delays while we called their bluff. *We don't think we have anything to gain by giving them an opportunity to respond.*

It is also our position that the City needs to send the letter terminating the reservation of rights agreement before you sign our "agreement to recommend settlement" and that we need the "agreement to recommend settlement" to proceed with our scheduling, including getting out reasonable written notice, of an approval meeting with our clients. Consequently, we urge that the letter be sent out as soon as possible and that we need to finalize the "agreement to recommend settlement", [sic] get it signed by the respective parties to it, and get to work on the final agreement which will be signed by the authorized representative of our respective clients after the clients have given the final authority.

(*Id.*, Ex. 62) (emphasis added). Transportation was unaware of the contents of this email. (*Id.*, Ex. 3.)

Ms. Laquidara also asked for an "evaluation" from her defense counsel to try to bolster the settlement. As such, when Mr. Shields sent an email to Ms. Laquidara on August 1, 2005, noting that there were 400 plaintiffs that Mr. Shields "can't locate at all or who refused to cooperate and come in for an interview," Ms. Laquidara asked Mr. Shields whether she could share that information with the City's defense counsel (which was being paid for by Transportation). (*Id.*, Ex. 63.) Mr. Shields replied that he had "some uneasiness about sharing such information with Steel, Hector," and so the information was never provided to the City's defense counsel. (*See id.*) The communications were also never provided to Transportation. (*Id.*, Ex. 3.)

On August 1, 2005, Ms. Laquidara asked Mr. Shields to provide her seven days to

draft an ordinance approving the settlement. Mr. Shields responded, "I don't have any problem in giving seven days to get the ordinance, provided the agreement gets signed no later than Friday [August 5, 2005]." (*Id.*, Ex. 64.) A few hours later, Mr. Shields sent Ms. Laquidara a draft of a demand letter. (*Id.*, Ex. 3.) He asked for her input on what to include "so as to counter any misimpression [Transportation] claim[s] to have about recent discovery." (*Id.*, Ex. 65.)

Later that day, Mr. Shields sent Ms. Laquidara an email pressuring her to terminate the defense provided by Transportation stating:

Has the termination letter been sent to the insurance companies? As you know, we do not believe that we should sent [sic] out our Notice Letter until the termination letter has been sent. We thought the termination letter was going out yesterday, as we discussed on Friday, so we prepared the letter, stuffed the envelopes and put postage on the envelopes. We had to pull the letters at the last minute when the termination letter was not sent. . . . I hate to pressure you but we need to get the go ahead to proceed and we need the termination to be sent to do that.

(*Id.*, Ex. 66.)

On Wednesday, August 3, 2005, the City sent a letter to Transportation informing Transportation that the City had "determined conditionally to accept a proposal, quite similar to the proposal made by Plaintiffs in March 2005, to settle all claims." (Decl. of Richard Pratt, Ex. 67.) The letter attached a draft settlement agreement and a demand letter from Mr. Shields "insisting that the City enter the Agreement by this Friday or face its withdrawal." (*Id.*) The letter continued:

The proposal has only conditionally been accepted, and is subject to small modifications, but is essentially agreeable to

the City. We wished to afford [Transportation] a brief opportunity once again to withdraw their reservation of rights and declinations of coverage and undertake the policyholders' defense without limitation, or negotiate a settlement, inclusive of your clients, comprising different terms and amounts acceptable to Plaintiffs and the policyholders.

. . . .

Should the City act to consummate the settlement, it will simultaneously decline to accept any further defense tendered under the reservation of rights, having elected to limit its exposure by other means, and the defense team will presumably stop work at that point.

(*Id.*) Ms. Laquidara testified, however, that she was "certain" that the numbers in the proposal would not change, and explained "I couldn't get a better deal than than the one that was on the table." (*Id.*)

On the afternoon of August 3, 2005, Mr. Shields complained to Ms. Laquidara about the City's August 3 letter stating:

I had assumed, based on our conversation last Friday, that the letter would be a termination of the reservation of rights agreement unless [Transportation] agreed to defend without a reservation and thereby accept coverage of all claims asserted in the lawsuit, or agreed to settlement. That way you would be in a position to sign the Agreement on Friday, having terminated the defense agreement. It sounds to me that the letter was not a termination of the reservation of rights letter but was merely another demand that [Transportation] settle. Consequently, I don't see how we can be announcing a meeting to vote on a settlement agreement. To do so could be used as evidence that you agreed to a settlement before you terminated the agreement with the insurers

*and thus constituted a breach of the cooperation clause.*[16]

(*Id.*, Ex. 68) (emphasis added).

On August 4, 2005, Transportation responded to the City's August 3 letter, complaining about the short amount of time for review and describing the history of settlement discussions of which it was aware. (*Id.*, Ex. 69.) Furthermore, Transportation stated:

> In short, Transportation objects to the City's lack of cooperation in the defense of the underlying case as well as the facts and circumstances surrounding the most recent settlement proposal. Despite the City's frequent and prejudicial failure to cooperate, as well as its blatant bad faith attempts to shield information regarding the case and settlement from Transportation, Transportation remains willing to meet with you and/or the claimants' counsel to discuss the case.
>
> . . . .
>
> In the meantime[,] and as Transportation has frequently asserted to you in the past, Transportation reserves all of its rights under the applicable policies and law and insists that the City refrain from entering any settlement without its consent.

(*Id.*)

On Friday, August 5, 2005, the City informed Transportation that Mr. Shields had agreed to extend the settlement proposal deadline to August 10, 2005, giving Transportation an opportunity to engage the City and the *Williams* plaintiffs in settlement discussions. (*Id.*, Ex. 70.) However, the City continued saying:

> As our exchanges of correspondence to date make plain, the substantial differ-

ences of opinion between [Transportation] and the City with respect to the parties' respective duties are not liable to be resolved in such a conference, but the City welcomes any approach that would entitle it to the same benefit ... as the [*Williams* plaintiffs'] proposal.... Whether the City's decision is reasonable does not seem more likely to be resolved by mutual agreement than the question of whether it needs [Transportation's] permission to pursue this course.

(*Id.*)

On Monday, August 8, 2005, Transportation and the City had a conference call. Although the City had previously represented that "there is time for the discussion you propose," when Transportation suggested that the City and Transportation combine their efforts and reach out to the *Williams* plaintiffs together about settlement, Ms. Laquidara refused saying "the financial terms would not change." (*Id.*, Exs. 13, 71.)

On August 10, 2005, Transportation, as requested, formally responded to the settlement proposal attached to the City's August 3, 2005 letter stating:

> Based on the information provided (including the analysis from defense counsel that was apparently done after the settlement had been reached), Transportation explicitly declines to give consent to the settlement proposal because it is manifestly unreasonable. Moreover, the fact that the City has already agreed in principle to this settlement without consent has effectively neutralized Transportation's ability to have any

---

**16.** Here, Mr. Shields acknowledges that the actions in which the City and the *Williams* plaintiffs are engaging may be considered a breach of the cooperation clause. Thus, the logical inference is that he is attempting to instruct Ms. Laquidara on a course of action that will cause less suspicion and give them some cover should Transportation later allege a breach of the cooperation provision.

meaningful input or impact on the proposed settlement.

. . . .

Transportation strongly urges the City not to agree to this settlement, which is plainly unreasonable and tainted with bad faith. It is not in the City's best interest and it is extremely prejudicial to the insurers who have agreed to fully fund the City's defense in this matter. As such, Transportation does not consent to the proposed settlement. Any settlement consummated along the terms outlined in your August 3, 2005 correspondence would be an uncovered voluntary payment and would void the City's insurance coverage. Any effort to enter into such a settlement would be a direct and intentional breach of the City's contractual duties to Transportation and would preclude the City from any and all rights to recovery under the policies. Transportation thus expects and demands that the City not settle any claims that it asserts are Transportation's responsibility without Transportation's consent. Transportation reserves all of its rights in this regard and intends to enforce those rights if the City chooses on its own to incur liability by settling the [*Williams* action] without obtaining Transportation's consent.

(*Id.*, Ex. 71.) Also in the letter, Transportation gave a detailed explanation of its reasons for not agreeing to the proposed settlement. (*Id.*) Shortly thereafter, the City wrote Transportation explaining that it had "conditionally accept[ed]" the settlement offer and "conditionally reject[ed]" any further defense under a reservation of rights for the *Williams* action, as [Transportation] ha[s] refused to withdraw their reservations of right and declinations of coverage." (*Id.*, Ex. 72.)

The City and the *Williams* plaintiffs formally executed the settlement agreement on August 11, 2005, and on August 24, 2005, the City provided Transportation with copies of the executed agreement. On September 1, 2005, the City Council formally approved the settlement. (*See* Doc. No. 189, Exs. 127, 128, 129.)

The crux of this case is that Transportation contends the City breached the cooperation and voluntary payment clauses of the relevant insurance policies when they entered into a settlement agreement without the consent of and over the express objections of Transportation. This Court has previously ruled that the City indeed breached the cooperation and voluntary payment clauses of the insurance contract, and this breach substantially prejudiced Transportation. (Doc. No. 179, entered Apr. 11, 2006.) The present motion concerns the issue of whether by its words and actions Transportation exercised good faith and due diligence in attempting to bring about the City's cooperation.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). When a moving party has discharged its burden, the nonmoving party may not simply rest on the pleadings, but must "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S.

317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant, *Key West Harbour v. City of Key West,* 987 F.2d 723, 726 (11th Cir.1993), and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman,* 873 F.2d 256, 257 (11th Cir.1989).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the Court should not grant the summary judgment motion. *Augusta Iron & Steel Works v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir.1988). It must be emphasized that the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported summary judgment motion. Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

**B.**

The present case was filed as a Declaratory Judgment Action pursuant to 28 U.S.C. §§ 2201 and 2202. Jurisdiction was predicated pursuant to 28 U.S.C. § 1332, as complete diversity exists between the parties. Since federal jurisdiction arises in this case under the Court's diversity jurisdiction, according to *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny, the Court must apply state substantive law as to any matter not "governed by the Federal Constitution or by Acts of Congress." *Id.* 58 S.Ct. at 822; *see also* 28 U.S.C. § 1652. Accordingly, this Court has applied Florida state law throughout the disposition of this case, and the parties have not objected. *See Cavic v. Grand Bahama Dev. Co.,* 701 F.2d 879, 882 (11th Cir.1983) (finding that absent the parties raising a conflicts of law issue, the substantive law of the forum governs the case in the absence of facts justifying the application of the law of another jurisdiction).[17]

The present Motion for Summary Judgment is the third such motion Transportation has filed with respect to the issue of whether the City has forfeited indemnification under the terms of the insurance contract because it breached the cooperation clause. The first summary judgment motion was filed on November 7, 2005. (Doc. No. 110.) On April 11, 2006, this Court entered an Order granting in part and denying in part the motion. (Doc. No. 179.) In its April 11, 2006 Order, this Court found that Transportation had satisfied its duty to defend, and that Transpor-

---

**17.** The Restatement (Second) of Conflicts further supports this result stating:

[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law.... The forum will usually apply its own law for the reason that in this

way it can best do justice to the parties.... When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum....

Restatement (Second) of Conflict of Laws § 136 cmt. h (1971).

**1332**

tation complied with the requirements of Florida's Claims Administration Statute. The Court also found that Transportation did not cede control over the defense of the *Williams* action to the City by electing to defend the case under a reservation of rights, and that the City's conditional rejection of the defense was ineffective because it came after the City and the *Williams* plaintiffs had already reached a settlement agreement. Specifically, although the Court acknowledged the City could have regained control of the defense had it actually rejected the defense, *see Aguero v. First American Insurance Co.*, 927 So.2d 894, 898 (Fla. 3d DCA 2005), the City's rejection of the proffered defense was nevertheless illusory.[18]

Moreover, the Court, applying *Ramos v. Northwestern Mutual Insurance Co.*, 336 So.2d 71, 75 (Fla.1976), held the City had breached the cooperation clause of the insurance contract because: (1) the City failed to cooperate with Transportation; (2) the City's failure was material; and (3) the failure to cooperate substantially prejudiced Transportation.[19] The Court, however, did not rule that Transportation was excused from its obligations under the policies because the Court, at that time, was of the opinion that issues of material fact remained with respect to the final requirement of the *Ramos* test, which looks to whether the insurer exercised good faith and due diligence in attempting to bring about the cooperation of its insured. *Id.*

The exact scope of what constitutes an insurer's exercise of good faith and due

diligence in attempting to bring about the cooperation of its insured was, at the time, an issue that puzzled the Court because there was a paucity of Florida and Eleventh Circuit authority addressing the subject. In such cases where there is a lack of controlling authority, the Court must make an "educated guess as to how the Florida courts would resolve the issue." *Shapiro v. Associated Intern. Ins. Co.*, 899 F.2d 1116, 1118–19 (11th Cir.1990) (quoting *Smigiel v. Aetna Cas. & Sur. Co.*, 785 F.2d 922, 925 (11th Cir.1986)); *Trail Builders Supply Co. v. Reagan*, 409 F.2d 1059, 1061 (5th Cir.1969). Furthermore, parties presumably take a calculated risk when seeking a federal forum, rather than a state forum, to decide an unclear area of state law. *See DeWeerth v. Baldinger*, 38 F.3d 1266 (2d Cir.1994). After considering the parties' briefs and the cited case law, the Court sided with the City and framed the issue as "whether Transportation exercised good faith in bringing about cooperation and negotiating settlement during the underlying *Williams* litigation." (Doc. No. 179 at 22.)

On May 25, 2006, Transportation filed a Supplemental Motion for Summary Judgment, where it argued that even given the Court's broad articulation of the scope of the cooperation issue, it was entitled to Summary Judgment. (Docs. No. 188–90.) On October 11, 2006, the Court denied Transportation's Supplemental Motion for Summary Judgment stating: "the Court cannot find as a matter of law that Transportation attempted in good faith to foster cooperation and that a reasonable and pru-

---

**18.** The City's letter which rejected the defense stated the settlement offer was "conditionally accept[ed]," although Ms. Laquidara told Transportation the terms of the settlement would not change. The City also characterized the rejection as "conditional." Supposedly meaning that should the settlement fall through, the City would rescind the rejection. (*See* Decl. of Richard Pratt, Ex. 72.)

**19.** In its April 11, 2006 Order, the Court stated the test as a three-part test. (Doc. 179, at 20.) The Eleventh Circuit articulated the test, however, as a four part test in *Philadelphia Indemnity Insurance Co. v. Kohne*, 181 Fed.Appx. 888, 891 (11th Cir.2006). The substance of the test, however, remains the same, but in the future the Court will articulate the test as a four part inquiry.

dent person would not have either accepted the settlement proposed or negotiated a different settlement. These issues must be decided by the fact-finder." (Doc. No. 243 at 2.)

However, on July 20, 2006, Judge Monte C. Richardson, the Magistrate Judge assigned to this case, entered an Order Denying the City's Motion to Compel Production of Documents and Attendance at a Noticed Deposition. (Doc. No. 221.) Specifically, the Magistrate denied the City's request for "discovery in the form of documents, including Plaintiffs' claim file, litigation file, and all other documents relating to Plaintiffs' entire handling of the claims" and the City's request "to depose all individuals involved in Plaintiffs' handling of the claim." (*Id.* at 4.) The Magistrate thus rejected the City's argument that in determining whether Transportation exercised good faith and due diligence in fostering the City's cooperation, a totality of the circumstances analysis, which would examine the entire claims handling process, including any evaluation of the settlement, was required. Instead, the Magistrate concluded resolution of the issue required only "an analysis as to what actions [Transportation] took and what conversations [Transportation] had with the City in an attempt to foster cooperation from the City with regard to the settlement proposal in the *Williams* litigation." (*Id.* at 9.)

The City Appealed the Magistrate Judge's ruling arguing that the July 20, 2006 Order was in direct conflict with the District Court's April 11, 2006 Order. (Doc. No. 234, filed Aug. 7, 2006.) And, indeed, the City was to a certain degree correct. However, the Court noticed the Magistrate's Order cited a recent Eleventh Circuit decision, *Philadelphia Indemnity Insurance Co. v. Kohne,* 181 Fed.Appx. 888 (11th Cir.2006), which described the duty to foster cooperation inquiry as quite narrow. The Court was also aware of its power pursuant to Federal Rule of Civil Procedure 54 to revise any previous ruling before adjudicating all claims in a particular case. Thus, after considering the present case in light of *Kohne* and upon reexamining the applicable state law, it became apparent to the Court that its prior rulings on the scope of the insurer's duty to foster cooperation were no longer tenable. Accordingly, on November 11, 2006, this Court affirmed the Magistrate's July 20, 2006 Order in its entirety. (Doc. No. 244, entered Nov. 1, 2006.)

Not to be deterred, the City continued to argue the duty to foster cooperation inquiry required a totality of the circumstances analysis, and expressed this position in its Supplemental Case Management Report. (Doc. No. 252, filed Nov. 29, 2006.) The Court rejected the City's argument, finding that all remaining discovery should be tailored around the remaining issue "requiring only an examination of what Transportation did and said with respect to the City and the *Williams* [p]laintiffs, and what the City did and said with respect to the *Williams* [p]laintiffs and Transportation." (Doc. No. 261, entered Dec. 7, 2006.)

The City decided to ignore this ruling. On February 2, 2007, Transportation filed an Emergency Motion before Magistrate Judge Richardson seeking his assistance in enforcing this Court's prior rulings regarding the issue of Transportation's duty to foster cooperation. (Doc. No. 265.) In granting Transportation's Motion, Judge Richardson noted that the City was seeking discovery far afield of this Court's prior Orders. Instead of tailoring its discovery requests and deposition questions around communications between Transportation, the City, and the *Williams* plaintiffs, the City began inquiring into such issues as Transportation's claims handling practice, and its internal investigations

concerning the *Williams* action, and any internal assessment of the reasonableness of the proposed settlement. Judge Richardson found that these inquiries were outside the scope of the narrow cooperation issue. (Doc. No. 282, entered Mar. 5, 2007.) The City appealed the Magistrate's March 5, 2007 Order arguing in essence that the Magistrate had misstated the applicable issue, which, in their view, required an examination of "whether a reasonable and prudent person would not have either accepted the settlement or negotiated a different settlement." (Doc. No. 287, filed Mar. 22, 2007.) The Court again rejected the City's argument and affirmed the Magistrate's March 5, 2007 Order in its entirety. (Doc. No. 308, entered Apr. 30, 2007.)

Undaunted, the City served Transportation with the Expert Reports of Peter J. Hildebrand and Charles M. Miller, which were devoted quite heavily to evaluating Transportation's claims handling procedures, and to the issue of whether Transportation acted reasonably in rejecting the *Williams* settlement. Transportation moved to strike the reports. (Doc. No. 286, filed March 20, 2007.) Disregarding this Court's Mar. 5, 2007 Order, the City once again argued to the Magistrate Judge that "[t]he controlling legal principles regarding the meaning of good faith" used in "bad faith excess judgment cases," which requires an examination into the totality of the circumstances with regards to the insurer's handling of the claim, were applicable in the present case. (Doc. No. 298, filed Apr. 13, 2007.)

In a Report and Recommendation dated May 24, 2007, the Magistrate Judge recommended striking substantial portions of the expert reports, finding that large portions of the reports were outside the narrow scope of the duty to foster cooperation issue. (Doc. No. 315.) The City once again filed an objection, arguing "the good faith principles applied in 'bad faith' cases are applicable here." (Doc. No. 320 at 7.) The Court once again rejected the City's argument, and took issue with the City's refusal to abide by the Court's rulings noting "the issue before this Court, whether to strike the City's expert reports, emanates from the City's misunderstanding, or outright obfuscation, of this Court's prior rulings on the exact scope of the good faith and due diligence question that remains in this litigation." (Doc. No. 374, entered July 11, 2007.) The Court then took the opportunity to reiterate the applicable legal standards noting that the *Kohne* decision clarifies "that the proper inquiry in determining good faith in bringing about the insured's cooperation surrounds the insurer's communications and actions with respect to its insured. Furthermore, this Court previously recognized that in the context of this Declaratory Judgment action, it [was] also relevant to evaluate the City's and Transportation's actions towards and communications with the *Williams* plaintiffs to determine the good faith and due diligence requirement." (*Id.* at 3.)

Still refusing to accept this Court's rulings, the City argued in its statement of the case in the parties' Pretrial Statement that the issue for trial was whether "Transportation ... exercised good faith and due diligence in fostering cooperation[,] *and negotiating the settlement of the underlying Williams litigation.*" [20]

---

**20.** The Court held a Pretrial Conference on June 26, 2007, at the hearing the Court ordered the parties to submit a memorandum concerning inconsistent representations the Defendants had made to the Court and to the Magistrate Judge. The parties submitted the memoranda as requested. After reading each parties' memorandum, the Court remains troubled about the Defendants' behavior in this case. No motion for sanctions, however, has been filed.

(Doc. No. 326 at 7, filed June 19, 2007.) Indeed, in its response to the present summary judgment motion the City again attempts to recast the applicable issue as involving whether Transportation acted reasonably towards the City in negotiating a settlement. (Doc. No. 390, filed July 24, 2007.) Furthermore, at oral argument the City devoted the vast majority of its time to the facts surrounding the settlement of the *Williams* action.

Turning to the instant motion, despite the City's assertions to the contrary, the present issue is simply whether Transportation exercised due diligence and good faith in trying to bring about the City's cooperation as it attempted to defend the *Williams* action. *Phila. Indem. Ins. Co. v. Kohne*, 181 Fed.Appx. at 891; *Ramos v. Nw. Mut. Ins. Co.*, 336 So.2d 71, 75 (Fla. 1976). If this Court determines as a matter of law that Transportation fulfilled its duties under this contractual obligation to the City, Transportation will have no obligation to indemnify the City. Given the narrow scope of the issue and the undisputed facts which demonstrate that Transportation attempted in good faith to diligently communicate with the City in order to bring about its cooperation in defense of the *Williams* action, the Court finds that final summary judgment should be entered in favor of Transportation. Even the City, although on August 6, 2007, in open court, it attempted to retract its statement, has admitted that if the Court defines the cooperation issue narrowly, which it has, the effect "is to eliminate any need for trial." [21] (Doc. No. 287 at 3; filed March 22, 2007.) Moreover, even in its response to the in-

stant motion for summary judgment, the City asserts: "Transportation could obtain summary judgment based on its cooperation clause defense only if it were relieved of the obligations to act reasonably and in good faith *both* in seeking to foster the City's cooperation *and in negotiating settlement.*" Thus implying that if the Court limits the issue to whether Transportation acted reasonably and in good faith in seeking to foster the City's cooperation, Transportation could obtain summary judgment.[22] The Court agrees and finds that Transportation has discharged its obligation.

### C.

The misunderstanding of the relevant issue is derived from the City's attempt to conflate two very different types of cases: (1) "bad faith" cases; and (2) cooperation clause cases. In an attempt to resolve the confusion, the Court will attempt to explain the difference between the two actions as set out by Florida law.

■ A "bad faith" action arises in situations where an insurer has breached its contractual duty of good faith. Specifically,

> The contractual duty of the insure[r] to defend justifies an implication that the insurer will exercise ordinary care and good faith in so proceeding. Accordingly, when an insurer under such a policy contract undertakes to defend an action against the insured and becomes involved in negotiations for settlement, the law imposes the duty that it act therein in good faith.

21. The Court finds the City's retraction illusory, because after the City explained that the statement was a "misunderstanding," the City sidestepped the relevant issue before the Court and began arguing the reasonableness of settlement, which this Court had already ruled was irrelevant. Thus, the City never substantively retreated from their prior position that a trial was unnecessary. As such, the Court takes the City's statement to mean the City consents to Summary Judgment.

22. This statement is consistent with the position the City took in its March 22, 2007 pleading. (*See* Doc. No. 287 at 3.)

*Nationwide Mut. Ins. Co. v. McNulty,* 229 So.2d 585, 586 (Fla.1969). Thus, failure to negotiate a settlement in good faith gives rise to what is commonly referred to as a "bad faith" action. *See N. Am. Van Lines, Inc. v. Lexington Ins. Co.,* 678 So.2d 1325 (Fla. 4th DCA 1996) (stating that under Florida law a bad faith claim is an action arising *ex contractu* requiring plaintiff to demonstrate that the defendant breached the corresponding duty of good faith). Florida law provides for two distinct, but similar causes of action for "bad faith": (1) first-party "bad faith" actions; and (2) third-party "bad faith" actions. *Allstate Indem. Co. v. Ruiz,* 899 So.2d 1121, 1125 (Fla.2005). Under Florida law, a first party's ability to bring a "bad faith" claim against an insurer is a right created by statute, and not recognized at common law. *Allstate Ins. Co. v. Clohessy,* 32 F.Supp.2d 1328, 1331 (M.D.Fla.1998); *United Guar. Residential Ins. Co. of Iowa v. Alliance Mortgage Co.,* 644 F.Supp. 339 (M.D.Fla.1986). This right is afforded pursuant to section 624.155, Florida Statutes, which provides in pertinent part:

> (1) Any person may bring a civil action against an insurer when such person is damaged:
>
> > (b) By the commission of any of the following acts by the insurer:
> >
> > > 1. Not attempting in good faith to settle claim when under all the circumstance, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or its interest

§ 624.155(1)(b)(1), Fla. Stat. (2005).

Third-party "bad faith" actions are rooted in the common law, and were first recognized in Florida in 1938. *Ruiz,* 899 So.2d at 1125 (citing *Auto Mut. Indem. Co. v. Shaw,* 134 Fla. 815, 184 So. 852 (1938)). In either type of action, when determining whether an insurer has acted in bad faith and failed to "act[ ] fairly and honestly

toward its insured and with due regard for its interest" a court must apply a "totality-of-the circumstances" standard. *Talat Enters. Inc. v. Aetna Cas. & Sur. Co.,* 952 F.Supp. 773 (M.D.Fla.1996); *State Farm Mut. v. Laforet,* 658 So.2d 55, 62–63 (Fla. 1995).

■ However, a "bad faith" action for failing to settle a claim does not accrue until there is a determination of whether the insurer is required to indemnify the insured. *Blanchard v. State Farm Mut. Auto. Ins. Co.,* 575 So.2d 1289, 1291 (Fla. 1991) (finding in an uninsured motorist case that a cause of action against the uninsured motorist carrier does not arise until after the resolution of the underlying litigation contract dispute over whether the insurer has an obligation to provide benefits); *Vanguard Fire & Cas. Co. v. Golmon,* 955 So.2d 591, 594 (Fla. 1st DCA 2006) (finding that absent a resolution of the issues of liability and actual damages, there is no basis for a bad faith suit).

■ As such, a "bad faith" action would only lie in the present case after the Court has determined Transportation must provide coverage under the terms of the insurance policies. Furthermore, "bad faith" actions do not arise by way of an affirmative defense to a breach of contract claim. They arise as a separate and divisible action once a court has determined the issue of coverage in favor of the insured or the injured third-party. *See Blanchard,* 575 So.2d at 1291.

Perhaps realizing that its "bad faith" assertion was specious, the City's argument has evolved into an attempt to raise a general argument that its breach of the cooperation clause should be excused because Transportation breached its general contractual duty of "good faith" in failing to settle the *Williams* litigation. As support for this argument, the City cites to *Ramos,* 336 So.2d at 74. Specifically, *Ra-*

*mos* requires that in order to excuse an insurer's performance under a cooperation clause, the insurer must demonstrate, *inter alia*, that "the insurer has exercised diligence and *good faith* in seeking to bring about cooperation of the insured." *Id.* Furthermore, *Ramos* makes explicit the otherwise implicit requirement that the insurer must "in good faith compl[y] with the terms and conditions of the policy." *Id.* The City argues that Transportation has breached this general duty by failing to settle the *Williams* action. However, as the Court will explain, the City's creative theory is pure sophistry.

■ It is generally held that the common law implies a covenant of good faith and fair dealing in every contract. *See* 16 *Williston on Contracts* § 49:46 (Richard A. Lord ed., 4th ed.1990). The UCC also embodies this requirement. *See* U.C.C. § 1–304. Essentially, the implied covenant of good faith imposes a burden on both parties that neither will do anything to injure the right of the other to receive the benefits of the agreement, and the obligation to do everything that the contract presupposes the party will do to accomplish the contract's purpose. *See Fireman's Fund Ins. Co. v. Sec. Ins. Co. of Hartford,* 72 N.J. 63, 367 A.2d 864, 869 (1976) (citing 5 *Professor Samuel Williston on Contracts* § 670, 159–60 (3d. ed.1961)).

Although the term "good faith" is used liberally, its precise meaning is nevertheless elusive. Conceptually, "good faith" is generally not applied by itself without resort to the very concept being defined or to its reverse concept of "bad faith." *See N. Am. Van Lines,* 678 So.2d at 1330 (defining bad faith contract action as a breach of the duty of good faith). Thus, "good faith" in the insurance context is generally defined as the duty to consider the insured's interests as well as the interests of the insurer when the insurer is discharging a specific responsibility pursuant to the insurance contract, such as its duty to defend or settle. *See Venn v. St. Paul Fire & Marine Ins. Co.,* 99 F.3d 1058, 1064–65 (11th Cir.1996); *Kricar, Inc. v. Gen. Accident, Fire & Life Assurance Corp.,* 542 F.2d 1135, 1136 (9th Cir.1976); *Boston Old Colony Ins. Co. v. Gutierrez,* 386 So.2d 783, 785 (Fla.1980). Essentially, good faith and bad faith are two sides of the same coin. Put differently, the absence of "good faith" constitutes "bad faith," and qualitative descriptions of "good faith" conduct are often compared to qualitative descriptions of "bad faith" conduct composed of terms that are simply the antonyms of terms used to describe "good faith." *See Am. Fid. & Cas. Co. v. Greyhound Corp.,* 258 F.2d 709, 715–16 (5th Cir.1958) (holding that "good faith" requires diligent efforts and honesty); *Daiwa Prod., Inc. v. Nationsbank,* 885 So.2d 884 (Fla. 4th DCA 2004) (stating that "good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing"); *DeLaune v. Liberty Mut. Ins. Co.,* 314 So.2d 601, 602 (Fla. 4th DCA 1975) (noting that acting in "bad faith" includes behaving in a negligent and otherwise unreasonable manner); *Hodges v. Standard Accident Ins. Co.,* 198 Cal.App.2d 564, 574, 18 Cal.Rptr. 17 (Cal. Ct.App.1961) (finding "good faith" implies honesty, fair dealing, and full revelation; "bad faith" implies dishonesty, fraud and concealment). *But see* Stephen J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv. L.Rev. 369 (1980) (arguing that it is intellectually indefensible to define a term such as "good faith" by its converse "bad faith").

The City's argument is the Court must first analyze whether Transportation breached its implied duty of good faith with respect to the terms of the insurance contract. Specifically, the Court inter-

prets this to mean that the Court must determine whether Transportation has discharged its duty of "good faith" in settling the *Williams* action *before* determining whether Transportation's performance is excused because of the City's breach. That must be their argument, otherwise the City is asking the Court to abstractly apply the concept of "good faith" without aligning the concept to any specific requirement embodied in the insurance contract. Applying the above stated principles, the problem is apparent: the flip side of the City's "good faith" argument is a claim that Transportation has acted in "bad faith" in failing to settle the *Williams* action. However, the City's theory fails to account for the fact that before a "bad faith" action may lie, the Court must determine whether coverage exists. And the question of whether coverage exists is the operative question before the Court at this time.

The cases the City cites as support for its argument do not challenge this conclusion. In *Venn v. St. Paul Fire and Marine Insurance Co.,* one of the issues before the court was whether in the context of a bankruptcy case an insurer owes a duty of good faith only to the bankruptcy estate, rather than to its insured. 99 F.3d at 1058. The court found:

> [A]n insurer owes under Florida law a continuous duty to negotiate and settle in good faith a third party claim against its insured. This duty arises from the moment the insurer assumes the insured's defense and matures into a cause of action when the third party obtains a final judgment in excess of policy limits.

*Id.* at 1065. The "cause of action" to which the court refers is a "bad faith" action, which does not accrue until: (1) there is a determination that coverage exists; and (2) as *Venn* explains, the third-party obtains a final judgment in excess of policy limits.[23] In *Venn*, there was no argument that coverage did not exist, only an argument that the insurer failed to settle a claim in "good faith."

The City also relies on *North American Van Lines, Inc. v. Lexington Insurance Co.* In *North American Van Lines,* an insured trucking company brought an action for bad faith, and other claims, against its primary and excess indemnity insurers, alleging that the insurers delayed in tendering policy limits, leading to increased settlement value of a tort claim and requiring the insured to pay more to settle. 678 So.2d at 1328. Although the court discussed that an insurer owes a duty of good faith in settling a claim, there was no issue with respect to whether coverage existed. *See id.* In fact, the court noted that the policies obligated the indemnity insurers to handle the claims. *Id.* As such, the City's reliance on *North American Van Lines* is misplaced.

Although the City cites several other cases, they all fail to provide support for the City's argument because in each case there was simply no dispute on the issue of whether the insurer was to indemnify its insured. In addition, the City fails to cite, and the Court has been unable to find, any case in which an insured was able to assert an insurer's breach of the duty of good faith in failing to settle a claim as an affirmative defense to the insured's own breach of the cooperation clause.

**D.**

Unlike a "bad faith" action where an insured seeks damages for the insurer's breach of its duty to settle, cooperation clause cases are usually brought by an

---

**23.** The Court need not discuss the issue of whether a final judgment has been entered in the *Williams* action, because that issue would only accrue if there was a determination that coverage exists.

insurer who seeks to be excused from indemnifying its insured because its insured breached its duty to cooperate.[24] Most insurance policies include what is often referred to as a "cooperation clause." In instances where a policy does not include such a clause, one is usually implied at law. *See Mimbs v. Commercial Life Ins. Co.*, 832 F.Supp. 354, 358 (S.D.Ga.1993) (finding an implied duty of cooperation and non-hindrance existed under health insurance policy); *First Bank of Turley v. Fid. & Deposit Ins. Co. of Md.*, 928 P.2d 298, 304 (Okla.1996) (finding that an insured has a duty to cooperate which is both contractual and implied at law). The purpose of a cooperation clause is to protect the insurer from collusion between the insured and injured third parties, while making it possible for the insurer to conduct a proper investigation of the claim, and determine its own obligations. *Hudson Tire Mart, Inc. v. Aetna Cas. & Sur. Co.*, 518 F.2d 671, 674 (2d Cir.1975); *Martin v. Travelers Indem. Co.*, 450 F.2d 542, 553 (5th Cir.1971); *Farmers Cas. Co. v. Green*, 390 F.2d 188, 191 (10th Cir.1968). Accordingly, an insured breaches the cooperation clause when it fails to communicate honestly and openly with its insurer. *Wildrick v. N. River Ins. Co.*, 75 F.3d 432, 436 (8th Cir.1996). An insured's breach of the cooperation clause precludes coverage and releases the insurer from any responsibilities that it may otherwise have under the terms of the contract. *Sargent v. Johnson*, 551 F.2d 221, 232 (8th Cir.1977); *Ramos*, 336 So.2d at 71; 16 *Williston on Contracts* § 49:106 (Richard A. Lord ed., 4th ed.1990).

■ Under Florida law, an insurer is excused from its obligations under the cooperation clause if the insurer demonstrates: (1) the insured failed to cooperate; (2) the lack of cooperation was material; (3) the insurer suffered substantial prejudice as a result of the insured's failure to cooperate; and (4) the insurer exercised diligence and good faith in trying to bring about the insured's cooperation. *Kohne*, 181 Fed.Appx. at 891 (citing *Ramos*, 336 So.2d at 75).[25] Since the Court has already determined that the City breached its own obligations to cooperate, for purposes of this Motion, the Court will focus on the fourth requirement—whether the insurer exercised diligence and good faith in trying to bring about the insured's cooperation.

■ In order to satisfy its burden of diligently and reasonably attempting to secure the insured's cooperation, the insurer must in good faith employ methods that are reasonably calculated to locate the insured and secure its cooperation. *See Kohne*, 181 Fed.Appx. at 892; *First Am. Title Ins. Co. v. Nat. Union Fire Ins. Co.*, 695 So.2d 475 (Fla. 3d DCA 1997) (finding that insurer complied with all conditions of the policy by requiring the insured to keep it informed about ongoing litigation). There is a paucity of Florida law on the subject of what exactly constitutes diligently attempting to foster cooperation under the cooperation clause, but what little the Court and the parties have located is consistent with authority from other states. As such, it has been held that an insurer fails to exercise due diligence in fostering cooperation when an insurer fails

---

24. Under Florida law, "bad faith" actions, like cooperation clause actions, arise *"ex contractu* rather than in tort." *Venn*, 99 F.3d at 1065; *Swamy v. Caduceus Self Ins. Fund, Inc.*, 648 So.2d 758, 760 (Fla. 1st DCA 1994) (noting that Florida is in the minority, and

that most jurisdictions view "bad faith" actions as arising in tort).

25. The Court reiterates that although *Ramos* articulated the test as a three-part inquiry, the Court will articulate it as a four-part test pursuant to *Kohne*. *See supra* note 19.

to notify an insured of the necessity to attend trial. *Hannig v. Hartford Accident & Indem. Co.*, 342 Ill.App. 539, 544–45, 97 N.E.2d 476, 478–79 (Ill.App.Ct.1951). An insurer fails to exercise due diligence when its efforts are perfunctory and minimal. *Shelter Mut. Ins. Co. v. Page*, 316 Ark. 623, 873 S.W.2d 534, 537 (1994) (finding that the insurer did not satisfy requirement when it failed to investigate accident, failed to contact the insured through its employer, and merely attempted to call insured at previous address or drive by insured's former house). An insurer's efforts are also deemed insufficient when it provides untimely or inadequate notice of trial to its insured. *Rosalez v. Unigard Ins. Co.*, 283 Or. 63, 581 P.2d 945 (1978) (insurer failed to provide insured actual notice of trial). An insurer exercises due diligence when it instructs insured to notify it if a suit is filed so that it can re-evaluate its position and determine whether it owes a duty of defense with respect to a claim. *First Am. Title*, 695 So.2d at 475. An insurer also satisfies its obligation to exercise due diligence in fostering cooperation when it takes steps to ensure that its insured knows that it is bound by the conditions of the insurance policies. *Kohne*, 181 Fed.Appx. at 892.

 Turning to the facts of this case, throughout 2004 and 2005, while the *Williams* action was pending and settlement negotiations were ongoing between the City and the *Williams* plaintiffs, Transportation wrote numerous letters informing the City that it was opposed to the City's attempts to unilaterally settle the case. Specifically, in December 2004, Transportation informed the City that Transportation wanted to be included in all settlement discussions, and the City's representative, Ms. Laquidara, admitted she was aware of this position. Moreover, Transportation reiterated that the City was bound by the terms of the insurance contracts. Specifically, Transportation

stated that since it was fulfilling its duty of providing the City with a defense, the City could not settle the *Williams* action without Transportation's consent, and "if the City of Jacksonville settles without [Transportation's] permission, it breaches the consent provisions and voids its rights to coverage." Transportation reiterated this position verbally and in writing on numerous occasions, and, as this deposition excerpt demonstrates, Ms. Laquidara indicated that the City understood Transportation's position.

Q: The City understood in December 2004 that it was Transportation's position that the City couldn't settle without its consent; right?

A: I understand that it was your position that we could not settle without your consent. We disagreed with it—

Q: But you understood the position?

A: Yes.

(Decl. of Richard Pratt, Ex. 11.)

Notwithstanding Transportation's attempts to remind the City that it was bound by the terms of the insurance contract, the City continued to unilaterally negotiate with the *Williams* plaintiffs. In May 2005, while unaware of the continued discussions between the City and *Williams* plaintiffs, Transportation contacted the City in order to begin a settlement dialogue to resolve the *Williams* action. However, a settlement in principle was already in place, which contemplated that the City would contribute $25 million and assign to the *Williams* plaintiffs a claim for $75 million under the insurance policies. Without knowledge of this "settlement in principle," Transportation proposed a high/low settlement structure, and the City and counsel for the *Williams* plaintiffs indicated some interest in the proposal. But what the record makes clear is that the City and the *Williams*

plaintiffs much preferred their own settlement discussions to the exclusion of Transportation, and rejected Transportation's repeated requests for a meeting to discuss the case. Ultimately, the City and the *Williams* plaintiffs agreed to the $25/$75 million settlement structure without Transportation's consent.[26]

As such, Transportation's efforts of repeatedly informing the City that it was bound by the terms of the contract were neither perfunctory nor minimal. *Page,* 873 S.W.2d at 537. Transportation took good faith efforts to meet with the City in order to discuss the *Williams* litigation, and informed the City of its obligations with respect to the *Williams* action. *Cf. Hannig,* 97 N.E.2d at 476(finding that where insurer made one call to a tavern and left a message with a stranger to inform him of a trial insurer failed to make good faith efforts to bring about cooperation of the insured). Moreover, Transportation took good faith efforts to communicate its position to the City, reminding the City that it was bound by the terms of the insurance contract, and informing the City of the consequences of breaching those terms. *See Kohne,* 181 Fed.Appx. at 892 (finding that insurer must make some effort to ensure that the insured knows that it is bound by the insurance policy's conditions). Accordingly, this Court finds that Transportation took steps in good faith that were reasonably calculated to bring about and foster the City's cooperation. *See id.; First Am. Title,* 695 So.2d at 475.

### E.

As the undisputed facts demonstrate, Transportation attempted with due diligence and good faith to foster the City's cooperation by informing the City that it was bound by the terms of the insurance

contract, and there were grave consequences if the City breached those provisions. Those efforts ultimately failed. The reason Transportation's efforts failed was because the City, by its own affirmative actions, rendered any good faith effort of fostering cooperation futile.

Conceptually, the duty to cooperate arises in the insurance context as a subpart of the insurer's duty to defend. *See* 14 Lee R. Russ & Thomas F. Segalia, *Couch on Insurance* § 199:1 (3d ed.1999). The need for this ongoing relationship is apparent because the insurer must have unfettered access to information after a claim arises in order to effectively defend the claim and mitigate any losses it may incur in indemnifying its insured under the terms of the contract.

■ The duty to cooperate arises under Florida law even if the insurer provides a defense under a reservation of rights so long as the insured accepts the defense. Pursuant to Florida law, the obligation to defend is quite broad, and an insurer complies with its duty to defend even when tendering a defense under a reservation of rights. *See, e.g., Giffen Roofing Co. v. DHS Developers, Inc.,* 442 So.2d 396, 396–97 (Fla. 5th DCA 1983). However, the insured is not required to accept such a conditional defense and may elect to provide its own defense and take control of the litigation. *Taylor v. Safeco Ins. Co.,* 361 So.2d 743, 745–46 (Fla. 1st DCA 1978) (finding insured was not bound to accept a conditional defense and could provide its own defense at its expense and take control of the litigation and any settlement). In such a case, the duty to cooperate does not arise because the insured has affirmatively made the decision to sever its relationship with its insurer in

---

**26.** It is also worth noting, notwithstanding their disagreement with respect to the law, the City assured Transportation it would not

enter into any settlement without involving Transportation in the settlement discussions.

defending its claim. *See id.* (finding that putative insured was not compelled to give insurer confidential information while defending himself after rejecting insurer's offer to provide a defense under a reservation of rights). The duty does arise, however, if the insured accepts such a conditional defense. *See United Nat'l. Ins. Co. v. Jacobs,* 754 F.Supp. 865, 870–71 (M.D.Fla.1990) (applying cooperation clause principles in case where insured accepted defense under a reservation of rights); *Giffen Roofing,* 442 So.2d at 396 (finding in case where insurer provided a defense under a reservation of rights and insured accepted the defense, insured lacked the authority to control defense).

 In this Court's view, not only does an insurer have a contractual duty to defend an insured, but as a corollary, the insurer has a contractual right to defend. *Travelers Indem. Co. of Ill. v. Royal Oak Enter., Inc.,* 344 F.Supp.2d 1358, 1370 (M.D.Fla.2004) (Hodges, J.); *see Hudson Tire Mart,* 518 F.2d at 674 (noting that insurer could insist on insured's appearance at a scheduled examination under oath in spite of insured's Fifth Amendment objections). Thus, the insurer has a corresponding right to unfettered cooperation from its insured, and a right to be free from any interference in defending or settling a claim. Indeed, the insurer has a right to be free from interference in discharging any of its obligations under the insurance contract, including fulfilling its obligation to use due diligence and good faith in bringing about the cooperation of its insured. Words or actions on the part of the insured that would obstruct an insurer from discharging its contractual obligations would serve to bar the insured from later claiming that the insured failed to perform. *See Bitzes v. Sunset Oaks, Inc.,* 649 P.2d 66, 70 (Utah 1982). The necessary correlation to this proposition is that an insurer is excused of its contractual obligations if its actions are rendered

hollow by the actions of its insured. *See Waksman Enter., Inc. v. Or. Prop., Inc.,* 862 So.2d 35, 43 (Fla. 2d DCA 2003) ("[T]he law does not require that a party to a contract take action that would be clearly futile."); *Blackmon v. Hill,* 427 So.2d 228 (Fla. 3d DCA 1983) (finding that the exercise of reasonable diligence does not "require the undertaking of an effort which clearly would be futile.").

 In this case, Transportation's efforts to foster cooperation were thwarted by the City. Although Transportation retained control over the litigation, and was the final arbiter with regard to settling the *Williams* action, the City claimed that it controlled the litigation and prevented Transportation from participating in meaningful settlement-related discussions, prejudicing Transportation's right to defend the case and control the litigation. In fact, on one occasion an attorney representing the City testified that Transportation was "deliberately not invited" to a meeting so that the City and the *Williams* plaintiffs could craft a settlement agreement requiring Transportation to tender $75 million in insurance proceeds.

Furthermore, although Transportation should have been apprised of all settlement related communications between the City and the *Williams* plaintiffs, the City failed to disclose to Transportation that: (1) the City entered into a Joint Defense Agreement with the *Williams* plaintiffs; (2) Ms. Laquidara engaged in a series of negotiation discussions with Mr. Shields, culminating in the March 14 settlement proposal, which the City described to Transportation as "just received"; (3) Ms. Laquidara agreed to recommend the March 14 settlement proposal to the City Council in a shade meeting held April 2005, prompting Mr. Shields to declare that a "settlement in principle" was in place; and (4) while Transportation was

trying to negotiate a "high/low" settlement proposal in June and July 2005, Ms. Laquidara and Mr. Shields reinitiated discussions of the March 14 "two tier" proposal. The City also represented to Transportation that it had time to negotiate a different settlement in August, and further represented that settlement negotiations were ongoing and terms of the settlement were uncertain, while knowing that "a deal was struck."

Under the terms of the insurance contract and pursuant to Florida law, Transportation was charged with the duty and the right to defend the *Williams* action, and in keeping with its obligations under the cooperation clause it was required to take diligent good faith steps to bring about the City's cooperation; however, the City's duplicity rendered any attempt on Transportation's part of fostering cooperation futile. Accordingly, Transportation was discharged from its duty, and the City is barred from asserting that Transportation failed to perform its obligation under the cooperation clause.

### III.

Throughout this case, the City has argued that Transportation acted unreasonably in attempting to settle the *Williams* action. On many occasions the City expressed its frustration with Transportation's approach to settlement. It seems that Transportation believed the claims brought by the *Williams* plaintiffs were defensible while, on the other hand, the City was fearful that Transportation was potentially exposing it to a catastrophic verdict. The City felt that Transportation's approach was unacceptable, and so attempted to flout its duties under the terms of the insurance contract in order to protect itself. The Court takes no position

with respect to Transportation's reasonableness in approaching settlement, and acknowledges that the City may have been correct. Perhaps Transportation was behaving unreasonably with respect to settlement? So, what was the City to do? Florida law provides two options for an insured who believes that its insurer is acting negligently in settling a case. Had the City followed one of these options it would not find itself in breach of its insurance policies, causing it to forfeit coverage.

First, unlike other jurisdictions,[27] Florida law provides that an insurer who offers a defense under a reservation of rights retains control over the litigation. *See Jacobs,* 754 F.Supp. at 870–71; *Taylor,* 361 So.2d at 743. However, an insured is not compelled to accept a conditional defense, and is free to choose to control the litigation and enter into a reasonable settlement so long as it rejects the conditional defense. *See Jacobs,* 754 F.Supp. at 870–71. Thus, the City could have rejected the defense tendered by Transportation, paid for its own defense, and negotiated a reasonable settlement. Once the settlement was in place, the City could commence an action to determine coverage under the terms of the insurance policies and recover the costs incurred by providing its own defense. *See Bellsouth Telecom., Inc. v. Church & Tower of Fla., Inc.,* 930 So.2d 668, 671–72 (Fla. 3d DCA 2006) ("It is well-settled law that, when an insurer agrees to defend under a reservation of rights or refuses to defend, the insurer transfers to the insured the power to conduct its own defense, and if it is later determined that the insured was entitled to coverage, the insured will be entitled to full reimbursement of the insured's litigation costs.") Although the City may con-

---

**27.** *See Ins. Co. of N. Am. v. Spangler,* 881 F.Supp. 539 (D.Wyo.1995) (finding that insurer who defends under a reservation of rights not allowed to control the defense); *United Serv. Auto. Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246 (1987) (same).

tend that it did reject the defense provided by Transportation, that rejection was merely conditional; moreover, the rejection was ineffective because the City and the *Williams* plaintiffs had for all intents and purposes already entered into a settlement agreement.[28]

■ Second, an insured could simply accept the defense and put its faith in the insurer to negotiate a reasonable settlement. If the insurer fails to approach settlement reasonably and in good faith and exposes the insured to liability in excess of the policy limits, and there is a determination that the insured is entitled to indemnification under the insurance policy, the insured may bring a "bad faith" action based on the insurer's breach of its duty to settle or compromise a claim. *See Blanchard,* 575 So.2d at 1291; *McNulty,* 229 So.2d at 586.

Accordingly, the City could have simply accepted the defense tendered by Transportation, and relied on Transportation to fulfill its obligations to settle or compromise the *Williams* action in good faith. If the City's fears were realized and it was exposed to a settlement or verdict that was unreasonable, the City could have instituted a proceeding to determine the scope of coverage provided under the insurance policies, and after attaining a favorable ruling, the City could bring a cause of action against Transportation alleging that Transportation acted in "bad faith" with respect to settlement.

The City, however, failed to choose either of these courses, and instead decided that it could have the benefit of a multi-million dollar defense on one hand, but still retain control of settlement on the other. The City chose poorly, and has now lost the benefit of indemnification under the insurance policies.

## IV. Conclusion

For the above stated reasons, this Court finds that Transportation did in fact meet its obligations to use due diligence and good faith in bringing about the cooperation of its insured, but Transportation was nevertheless discharged from having to perform this duty because of the actions of the City which rendered its efforts futile.[29] Accordingly, it is

**ORDERED, DECREED, AND ADJUDGED**

1. Transportation's Motion for Final Summary Judgment (Doc. No. 367) is **GRANTED.**

2. The City's Counterclaims, Counts I, II, and III, are **DISMISSED WITH PREJUDICE.**

3. The trial scheduled for October 1, 2007, is cancelled.

---

28. *See supra* note 17 and accompanying text. It would seem inequitable to allow an insured to take control of the litigation at the eleventh hour so as to preserve its rights to coverage after it has (1) accepted a defense from its insurer, and then (2) prejudiced the insurer by settling the claim behind the insurer's back.

29. The City also continues to allege several counterclaims against Transportation; however, these counterclaims are meritless. As to Counterclaim I, the same rights and obligations exist under the lost policies that exist under the partially located 1966–68 and 1972–74 policies. The same duty to cooperate arises as a matter of law independent of the particular terms and conditions of the insurance policies. *See* 14 *Couch on Insurance* § 199:3 (3d ed.2007). Counterclaims II and III are similarly meritless, and are merely mirror images of the instant motion brought by Transportation. The Court has determined that Transportation has met its duty to defend, and the issue of Transportation's duty to indemnify is not properly before this Court in this action. Being that the City breached the cooperation clause of the insurance contracts and that Transportation met its obligation to foster cooperation, the City's counterclaims must be dismissed.

4. The clerk shall enter final judgment in favor of Transportation.

5. All pending motions are denied as moot.

6. The clerk is instructed to close this case.